IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 00-cv-00496-ZLW-BNB

JONATHAN T. GARRETT,

Plaintiff,

v.

G.L. HERSHBERGER,
S.M. ROWLETT, and
1 OR MORE UNKNOWN OFFICIALS AND/OR OFFICERS AT USP-ADX FLORENCE,
CO.,

Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter is before me on the **Defendants' Motion for Summary Judgment** (the "Motion"), filed January 20, 2005. For the following reasons, I respectfully RECOMMEND that the Motion be GRANTED and that summary judgment enter in favor of the defendants and against the plaintiff on both of the plaintiff's claims.

## I. STANDARD OF REVIEW

As a preliminary matter, I must liberally construe the pleadings of a *pro se* plaintiff. Haines v. Kerner, 104 U.S. 519, 520-21 (1972). Nevertheless, I cannot act as advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

The plaintiff filed his Complaint while *pro se*. Therefore, I provide the Complaint a liberal construction. On March 14, 2003, the district judge appointed counsel to represent the

plaintiff.  The plaintiff was represented by counsel when he filed Plaintiff's Response to

Defendants' Motion for Summary Judgment (the "Response") on March 28, 2005.

      In ruling on a motion for summary judgment, the facts must be viewed in the light most

favorable to the party opposing the motion and that party must be afforded the benefit of all

reasonable inferences to be drawn from the evidence.  Adickes v. S. H. Kress & Co., 398 U.S.

144, 157 (1970).  Rule 56(c), Fed. R. Civ. P., provides that summary judgment may be rendered

if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  A genuine issue of material fact exists

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

      The moving party bears the initial burden of demonstrating by reference to portions of

pleadings, depositions, answers to interrogatories and admissions on file, together with af-

fidavits, if any, the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 447 U.S.

317, 323 (1986).  The party opposing the motion is then required to go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

## II.   UNDISPUTED MATERIAL FACTS

      The plaintiff was convicted of Importation and Aiding and Abetting the Importation of

Marijuana; Conspiracy to Import; Possession with Intent to Distribute Marijuana; and Use of a

Telephone to Facilitate a Felony; in violation of 21 U.S.C. § 952, 960(a)(1), 960(b)(2), and 18

U.S.C. § 2.  *Motion*, Declaration of Theresa Montoya ("Montoya Decl."), ¶ 6; Attachment A.[1]

---

     [1]The defendants state that the drugs exceeded 35,000 pounds and the conviction carried a
35 year sentence.  Id. at p. 3, ¶ 1.  However, the evidence cited by the defendants does not

In 1981, the plaintiff began his incarceration with the Bureau of Prisons ("BOP") at FCI Talladega in Alabama.  <u>Id.</u> at Montoya Decl., ¶ 7; Attachment B.  While at FCI Talladega, he received three minor incident reports for unexcused absences from work.  <u>Id.</u> at Montoya Decl., ¶ 8; Attachment C.  He also received an incident report for Possession of Marijuana.  <u>Id.</u> at Montoya Decl., ¶ 9; Attachment C.

The plaintiff was transferred to the United States Penitentiary ("USP") in Terre Haute, Indiana, for close supervision.  <u>Id.</u> at Montoya Decl., ¶ 10; Attachment D.  While at USP Terre Haute, he received six incident reports for Use of Narcotics.  <u>Id.</u> at Montoya Decl., ¶ 11; Attachments E and F.  An internal investigation also revealed that the plaintiff had planned an escape from USP Terre Haute.  <u>Id.</u> at Montoya Decl., ¶ 12; Attachment C, pp. 1-2.  The escape plan involved the plaintiff's girlfriend sending him a small handgun concealed in a guitar case. <u>Id.</u> at Montoya Decl., ¶ 13; Attachment C, p. 2.  The plaintiff planned to use the gun to escape from staff during an escorted trip to a local hospital.  <u>Id.</u> at Montoya Decl., ¶ 14; Attachment C, p. 2.

On or about October 19, 1988, the plaintiff was sentenced in the United States District Court for the Southern District of Indiana to a one year consecutive sentence for being an Inmate in Possession of Marijuana inside a United States Penitentiary in violation of 18 U.S.C. §§ 1791(a)(2), (b)(3), and (c)(1)(D).  <u>Id.</u> at Montoya Decl., ¶ 15; Attachment A.  The plaintiff's conduct resulted in a transfer on September 29, 1989, to USP Leavenworth, Kansas, for close supervision.  <u>Id.</u> at Montoya Decl., ¶ 16; Attachments B and G.  While at USP Leavenworth, the

---

support these statements.  <u>Id.</u> at Attachment A; Attachment AH, p. 6, l. 23 - p. 7, l. 5.

Case 1:00-cv-00496-ZLW-BNB   Document 155   Filed 09/12/05   USDC Colorado   Page 4 of 17

plaintiff received three incident reports for Use of Narcotics.  Id. at Montoya Decl., ¶ 16;

Attachment H.  He also received an incident report for disruptive conduct.  Id.

On June 26, 1993, the plaintiff was transferred to USP Marion, Illinois, for adjustment

purposes.  Id. at Montoya Decl., ¶ 17; Attachment I.  This type of transfer is for the purpose of

placing the inmate in a new setting due to poor institutional adjustment or central inmate

monitoring systems concerns.  Id.  While at USP Marion, the plaintiff received incident reports

for Assault with Serious Injury, Fighting with Another Person, and Possession of Drugs.  Id. at

Montoya Decl., ¶ 18; Attachment H.  The charge of Assault with Serious Injury involved the

plaintiff and another inmate throwing a third inmate off the top tier of the range in the unit.  Id.

at Montoya Decl., ¶ 19; Attachments H and J.

On April 5, 1995, the plaintiff was transferred to ADX Florence shortly after it opened in

order to build the institution's population.  Id. at Montoya Decl., ¶ 20; Attachments B and K.

ADX Florence is the most secure federal prison in the country and is designed to house

dangerous, escape prone, and disruptive inmates.  Id. at Montoya Decl., ¶¶ 34-35.  Inmates

generally enter the ADX program in the general population.  Id. at Montoya Decl., ¶ 36.  This is

a very restricted setting where inmates are housed in single cells and have limited contact with

other inmates.  Id.

On June 14, 1995, the plaintiff received an incident report for Fighting, Code 201A.  Id.

at Montoya Decl., ¶ 20; Attachment H.

In April 1998, the plaintiff received an incident report related to an alleged altercation

with another inmate.  Id. at Montoya Decl., ¶ 21; Attachment L.  Defendant Rowlett had no role

4

in writing the April 1998 incident report.  Id. at Attachment AH, p. 94, l. 19 - p. 95, l. 21 and Exhibit 7.

The plaintiff asserts that in March 1999, he became eligible for transfer from ADX Florence to a less secure facility.  *Complaint*, p. 3A, sixth consecutive paragraph.  He met the "bare minimum" requirements to be eligible for transfer.  *Motion*, Attachment AH, p. 185, ll. 3-14.

The BOP has policies in place that address inmate transfers.  Id. at Montoya Decl., ¶ 37; Attachment W.  After demonstrating compliance with BOP rules for at least twelve months, inmates become eligible for consideration for placement in the less restrictive units, referred to as the "Step-Down Units," in preparation for transfer to an open population penitentiary.  Id. at Montoya Decl., ¶ 37; Attachment W, p. 2.  The Step-Down program progresses from the General Population (most restrictive) through the Intermediate, Transitional, and Pre-Transfer (least restrictive) housing units.  Id. at Montoya Decl.,¶ 38; Attachment W.

An inmate must have at least twelve months of clear conduct while housed in the General Population Unit and actively participate in programs before being considered for placement in the Intermediate Unit.  Id. at Montoya Decl., ¶ 39; Attachment W, pp. 2-3.  Additional factors to be considered in the recommendation for placement in the Intermediate Unit are positive overall institutional adjustment, personal hygiene, cell sanitation, and appropriate interaction with staff. Id. at Montoya Decl., ¶ 40; Attachment W, p. 3.  The Associate Wardens consult with the Warden for approval of placement in the Intermediate Unit.  Id. at Montoya Decl., ¶ 41; Attachment W, p. 3.

Once placed in the Intermediate Unit, an inmate must ordinarily have at least seven months of clear conduct before being considered for placement in the Transitional Unit.  Id. at Montoya Decl., ¶ 42; Attachment W, p. 3.  The inmate must meet the same requirements and undergo the same considerations prior to being recommended for placement in the Transitional Unit.  Id. at Montoya Decl., ¶ 43; Attachment W, p. 3.  The Associate Warden of Programs consults with the Warden for approval of this placement.  Id. at Montoya Decl., ¶ 44; Attachment W, p. 3.

The Pre-Transfer Unit is the final program requirement prior to transfer from ADX to a less secure institution.  Id. at Montoya Decl., ¶ 44; Attachment W, pp. 3-4.  Inmates are usually required to remain in the Pre-Transfer Unit for twelve months before being considered for transfer to another institution.  Id. at Montoya Decl., ¶ 45; Attachment W, p. 4.  An inmate may complete the progression from the General Population through the Pre-Transfer Unit within a minimum of thirty-six months.  Id. at Montoya Decl., ¶ 46; Attachment W, p. 4.  This time frame is contingent on clear conduct, program participation, institutional adjustment, and meeting the

intent of release readiness.[2]  Id.

On March 24, 1999, the plaintiff submitted an informal request asking that the incident report of April 1998 be expunged or, in the alternative, for information on how to have the incident report expunged.  Id. at Montoya Decl., ¶ 21; Attachment L.  The plaintiff was informed that he had to file a BP-8 form to request expungement of an incident report.  Id.  The mechanism for seeking relief from a disciplinary action is the BOP's Administrative Remedy process, which is initiated by filing a BP-8.  Id. at Montoya Decl., ¶ 21; 28 C.F.R. § 541.19.

On or about April 8, 1999, the plaintiff's supervision team, which included defendant Rowlett, submitted a request to transfer the plaintiff to a different facility.  *Motion*, Montoya Decl., ¶ 23; Attachment N.

On or about May 19, 1999, the plaintiff filed an Administrative Remedy at the institution level requesting that the April 1998 incident report be removed from his record.  Id. at Montoya Decl., ¶ 22; Attachment M.  On May 26, 1999, the plaintiff was informed that his Unit Team was in the process of expunging the incident report.  Id. at Attachment M.

On July 13, 1999, defendant Hershberger, Regional Director for the North Central Region, or his designee, denied the April 8, 1999, request to transfer the plaintiff to a less restrictive facility.  Id. at Hershberger Decl., ¶ 3.  The April 1998 incident report was in the

_____

[2]The "intent of release readiness" is described as follows:

> The most critical factor in determining an inmate's readiness to progress to and through the step-down program will be whether the factors, which originally lead to the inmate's placement at ADX, have been sufficiently mitigated to indicate the inmate can function successfully in a less-restricted unit without posing a threat to the security or orderly running of the institution.

Id. at Attachment W, p. 4.

plaintiff's file at the time Hershberger considered the request for transfer.  Id. at Attachment AI,

p. 57, ll. 18-20.  Hershberger probably considered the report when making his decision denying

the transfer request.  Id. at p. 56, l. 3 - 57, l. 20.  The plaintiff was informed that the Regional

Office determined that he required "additional time in a facility that offers the controls found at

the ADX," and that he could be reconsidered for a transfer in January 2000.  Id. at Montoya

Decl., ¶ 25; Attachment Q.  The plaintiff was further informed that the request for transfer was

denied on the following basis:

> A review of your situation reveals that you have a long history of
> serious disruptive behavior in the Bureau of Prisons dating to
> 1981.  While your conduct has improved recently, there are still
> concerns about your ability to function appropriately in an open
> penitentiary setting.  Consequently, it was determined that you
> should remain in the Step-Down Unit program at the ADX for an
> additional period of time.  It is hoped this additional time will
> allow you to confirm your opinion that you are ready for a less
> restrictive environment.

Id., Attachment S.

The plaintiff was transferred to USP Beaumont in March 2000.  Id. at Montoya Decl., ¶

32; Attachment B.  Less than one month after the transfer to Beaumont, on April 29, 2000, the

plaintiff received an incident report for possessing a ten inch knife in his cell.  Id. at Montoya

Decl., ¶ 33; Attachment V.  The plaintiff admitted the violation.  Id. at Montoya Decl., ¶ 33;

Attachments H and V.

Defendant Hershberger was the Warden of ADX from January 1996 until June 22, 1997,

when he was promoted to Regional Director for the North Central Region.  Id. at Attachment AI,

p. 8, l. 20 - p. 9, l. 4.  At the time of his deposition, defendant Hershberger was unaware of any

specific grievances filed by the plaintiff, or of the volume of grievances filed by the plaintiff.  Id.

at p. 12, ll. 7-25.  Defendant Rowlett was the Pre-Transfer Unit Manager at ADX.  *Complaint*, p.

2.  Defendant Rowlett was unaware of any previous lawsuits filed by the plaintiff or of any

specific administrative grievances filed by the plaintiff.  *Motion*, Attachment AJ, p. 135, l. 24 - p.

136, l. 1; p. 43, ll. 21-24.

### III.  ANALYSIS

The plaintiff brings two claims against the defendants:

> Claim I: "Continuing plaintiff's segregation from the BOP general population in the step down program at ADX Florence in retaliation for exercising his rights to free speech and the [sic] to petition violates plaintiff's first amendment rights."

> Claim II: "Continuing plaintiff's segregation from the BOP general population in the step down program at ADX Florence in retaliation for exercising his right to petition the courts of the U.S. violates the plaintiff's fifth amendment right to due process of law."

*Complaint*, p. 3.

The defendants assert that the plaintiff's retaliation claims must fail because the plaintiff

cannot establish retaliatory intent.[3]  "Prison officials may not retaliate against or harass an

inmate because of the inmate's exercise of his rights to access the courts."  <u>Smith v. Mashner</u>,

899 F.2d 940, 947 (10th Cir. 1990).  "This principle applies even if the action taken in retaliation

would be otherwise permissible."  <u>Id.</u> at 948.  While a prisoner enjoys no constitutional right to

be housed in a particular institution, prison officials do not have the discretion to punish an

---

[3]The defendants also assert that the Complaint should be dismissed because the plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act , 42 U.S.C. § 1997e(a).  On April 21, 2004, the district judge determined that the plaintiff exhausted his administrative remedies.  Consequently, this Recommendation addresses only the defendants' argument that the retaliation claims fail on the merits.

inmate for exercising his first amendment rights by transferring him, or refusing to transfer him, to a different institution.  Frazier v. Dubois, 922 F.2d 560, 561-62 (10th Cir. 1991).

An inmate, however, is not "inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he is engaged in protected activity."  Peterson v. Shanks, 149 F.3d 1140,1144 (10th Cir. 1998).  Therefore, to prevail on a claim of retaliation a plaintiff "must prove that but for the retaliatory motive, the incidents to which he refers . . . would not have taken place."  Id. (quotations and citation omitted).  The presentation of circumstantial evidence such as temporal proximity, a chronology of events, or suspicious timing may be sufficient to support allegations of retaliation.  See Smith, 899 F.2d at 949 (holding that the inmate sufficiently supported retaliation claim with "only means available to him - circumstantial evidence of the suspicious timing of his discipline, coincidental transfers of his witnesses and assistants").

### A.  Defendant Hershberger

The Complaint states that the plaintiff filed two separate civil actions for damages against ADX officials on June 12, 1996, and June 11, 1997, respectively.  *Complaint*, p. 3A, ¶¶ 4-5.  The plaintiff asserts that Hershberger denied his transfer "in retaliation for filing numerous requests for administrative remedy on treatment of prisoner's [sic] at ADX and for filing claims for damages on his co-workers and friends in above civil actions."  Id. at ¶ 7.

In an attempt to create a material fact dispute regarding Hershberger's alleged retaliation, the plaintiff makes several factual statements that are unsupported by the evidence.[4]  First, the

---

[4]I also note that the plaintiff's response to the summary judgment motion was due on March 18, 2005, *Minute Order dated March 15, 2004*, and was not filed until March 28, 2005. The plaintiff did not seek leave of court to file his response out of time.

10

plaintiff attempts to establish that Hershberger was personally aware of the many grievances filed by the plaintiff since his transfer to ADX and, therefore, Hershberger's denial of plaintiff's transfer request was in retaliation for filing all of these grievances.  *Response*, p. 2.  However, the plaintiff cites to portions of Hershberger's deposition testimony wherein Hershberger merely admits that, as Warden of ADX, he saw virtually all grievances that were filed by all inmates in the institution.  Id. at Exhibit 4, p. 36, ll. 18-20; p. 37, ll. 21-23; p. 38, ll. 1-4.  Hershberger does not admit to having any specific awareness of the plaintiff's grievances.  To the contrary, Hershberger testified that he was unaware of any specific grievances filed by the plaintiff, or of the volume of grievances filed by the plaintiff.  *Motion*, Attachment AI, p. 12, ll. 7-25.  Even if he had admitted to having knowledge of the plaintiff's filings, mere knowledge of the plaintiff's grievances is insufficient to establish that but for a retaliatory motive, Hershberger would not have denied the plaintiff's transfer request.

The plaintiff further attempts to establish that Hershberger's actions were the result of retaliatory motive by implying that Hershberger denied the plaintiff's transfer request because the plaintiff filed two lawsuits against ADX employees.  *Response*, pp. 2-3.  The plaintiff does not provide any evidence, however, that Hershberger was aware of the lawsuits.  The plaintiff attempts to overcome this problem by alleging that Hershberger admitted that one of the named defendants was a personal friend.  Id. at p. 3.  To the contrary, Hershberger testified only that the defendant was a *professional* friend, and that he had never had contact with him outside the institution.  Id. at Exhibit 5, p. 80, ll. 19-25; p. 81, ll. 1-7.  The connection between the plaintiff's suits against ADX employees and Hershberger's denial of the transfer request is far too tenuous to establish retaliatory motive.

Finally, the plaintiff cites to his affidavit, Exhibit 13, wherein he attests that Hershberger vowed revenge on him for filing grievances and lawsuits related to ADX. Id. at p. 8. The plaintiff does not, however, attach Exhibit 13 to the Response. Nevertheless, under C.D. Mosier v. Maynard, 937 F.2d 1521, 1524 (10th Cir. 1992), a plaintiff's complaint may be treated as an affidavit under Fed. R. Civ. P. 56(e) to the extent it contains statements that are based on personal knowledge and those statements have been sworn under penalty of perjury. The Complaint in this case is verified and contains the following statement: As Warden at ADX., "[i]n 1998, G.L. Hershberger verbally told me that if I continued to file Administrative Remedies for treatment of prisoners at ADX, 'I would remember him.' Then as Regional Director on July 13, 1999," he denied the request for transfer. *Complaint*, p. 3B.

I note first that Hershberger ceased being the Warden of ADX on June 22, 1997, at least six months before the alleged statement was made in 1998. In addition, the plaintiff's request for transfer was denied on July 13, 1999. Therefore, at least seven months passed between defendant Hershberger's alleged threat and his denial of the plaintiff's request for transfer. Hershberger's alleged threat, without more, is not sufficient to prove that, but for retaliatory motive, Hershberger would not have denied the plaintiff's transfer request. Nor are the words of the alleged threat sufficiently specific to indicate that Hershberger intended to take retaliatory action against the plaintiff.

Even if Hershberger's alleged threat was sufficient to establish retaliatory motive, the plaintiff fails to overcome the remaining hurdles to establishing retaliation. When determining whether an alleged retaliatory prison transfer violates a prisoner's constitutional rights, the court must analyze the claim under the principles set forth in Turner v. Safley, 482 U.S. 78, 84 (1987),

to determine if "the prison action is reasonably related to legitimate penological interests."

Frazier, 922 F.2d at 562. This balancing test requires the court to weigh the following factors:

> First, the lower court should inquire into whether there is a valid, rational connection between the prison action and the legitimate government interest put forward to justify it. Second, the lower court should determine whether there are alternative means of exercising the right that remain open to prison inmates. Third, the court should evaluate the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. And finally, the court should look for the presence of obvious, easy alternatives to the disputed prison activity. Of course, in conducting this analysis, the Supreme Court advises repeatedly that substantial deference is to be accorded to the prison authorities.

Id. (quotations, footnotes, and citations omitted).

Here, the evidence establishes that the plaintiff's transfer was denied because he had "a long history of serious disruptive behavior in the Bureau of Prisons dating to 1981" and there were still concerns about his "ability to function appropriately in an open penitentiary setting." The plaintiff, therefore, "required additional time in a facility that offers the controls found at the ADX." The plaintiff's undisputed history of serious disruptive behavior constitutes a valid, rational reason for denying the plaintiff's transfer request.

Moreover, there are no obvious, reasonable alternatives to the BOP's transfer policy. The inmate must demonstrate by his behavior that he is capable of functioning appropriately in a less restrictive environment prior to being transferred. Transferring an inmate whose behavioral history demonstrates that he is not ready to function appropriately in a less restrictive environment would, more likely than not, negatively impact the receiving prison. The only option for an inmate who has not demonstrated a readiness for transfer is the passage of time without disruptive behavior. The plaintiff was provided an opportunity to have his transfer

13

request reconsidered within five months, and his second request for transfer was granted.  The record establishes that the denial of plaintiff's initial transfer request was reasonably related to legitimate penological interests.

Once the defendants establish a rational reason for the action which is related to a legitimate government interest, in order to create a material issue of fact concerning the "but for" requirement, the plaintiff must demonstrate that the defendants' rational reason for the action is pretextual.  Cowles-Sims v. Fields, 72 Fed.Appx. 827, 831 (10th Cir. 2003).  See also Smith, 899 F.3d at 949-50 (suggesting that retaliation by prison officials against inmates is analyzed in the same manner as any other action by government officials in retaliation for exercise of a constitutional right).

The plaintiff does not provide any argument or evidence that the defendants' reasons for denying his transfer were pretextual.  He does not provide any evidence to create a material fact dispute regarding his long history of disruptive behavior or regarding the BOP's assessment of his inability to function appropriately in an open penitentiary setting.  Moreover, he admits he made a calculated effort to perform only the bare minimum that he believed necessary before seeking transfer.  Therefore, the plaintiff has failed to create a material fact dispute regarding whether his transfer would not have been denied "but for" retaliatory intent by Hershberger.

## B.  Defendant Rowlett

The plaintiff attempts to establish Rowlett's retaliatory motive by asserting that each of the plaintiff's grievances "ordinarily required some form of action by Defendant Rowlett" and that Rowlett, therefore, retaliated against the plaintiff for filing the grievances.  *Response*, p. 2. The evidence cited by the plaintiff does not establish that Rowlett had knowledge of the

plaintiff's grievance activity.  Id. at Exhibit 2, p. 18, ll. 2-18.  Rowlett merely admits that, ordinarily, inmates within his unit must come to him with complaints.  Id.  Contrary to the plaintiff's assertion, Rowlett testified that he was unaware of any previous lawsuits filed by the plaintiff or of any specific administrative grievances filed by the plaintiff.  *Motion*, Attachment AJ, p. 135, l. 24 - p. 136, l. 1; p. 43, ll. 21-24.  Even if Rowlett had admitted to having knowledge of the plaintiff's grievances, however, such awareness--without more--is insufficient to establish retaliatory motive.

The plaintiff attempts to establish as a matter of fact that Rowlett "improperly included an incident report that should have been expunged, and that should not have been included in the transfer recommendation." *Response*, p. 3.  The plaintiff does not provide any evidence to establish that Rowlett included the incident report in the plaintiff's request for transfer or that Rowlett even had knowledge that the incident report was included in the plaintiff's request for transfer.  Nevertheless, even if Rowlett included the incident report in the transfer request, the undisputed evidence establishes that the request for transfer was submitted on or about April 8, 1999, *before* the plaintiff formally requested expungement of the incident report on or about May 19, 1999.  Therefore, the inclusion of the incident report was not "improper" regardless of who was responsible for it.

Finally, the plaintiff attempts to hold Rowlett liable for the denial of his transfer request by alleging that Rowlett was acting in concert with Hershberger.  The plaintiff alleges the conspiracy as follows:

> Defendant Hershberger was superior to Defendant Rowlett, and made decisions (or supervised those making decisions) concerning Mr. Rowlett's pay and performance (see Exhibit 14).  If Mr. Hershberger wanted to retaliate against plaintiff, one way would

15

be to have his unit manager, Defendant Rowlett, include a bogus incident report with the transfer request. Therefore, one could rationally deduct that Defendant Rowlett acted in concert with Defendant Hershberger in submitting an improper incident report with Plaintiff's April 9, 1999 transfer request.

Id. at pp. 8-9.

Exhibit 14, as cited above, states that the Warden of ADX approves or denies recommendations regarding Rowlett's performance. Id. at Exhibit 14, p. 33, ll. 4-20. Hershberger ceased being the Warden of ADX on June 22, 1997. Therefore, Hershberger did not have any influence over Rowlett's pay and performance at the time the incident report was included in the plaintiff's request for transfer. The plaintiff's allegation of a conspiracy between Rowlett and Hershberger is wholly unsubstantiated.

The Complaint alleges that Rowlett verbally threatened the plaintiff and took actions against him for filing Administrative Remedies. *Complaint*, p. 3C. However, the statements are largely conclusory and self-serving, and are not based on personal knowledge. Id. Further, as discussed previously, the plaintiff has failed to establish that the defendants' proffered reasons for denying his transfer request are pretextual. Therefore, the plaintiff has failed to create a material fact dispute regarding whether his transfer would not have been denied "but for" retaliatory intent by Rowlett.

## IV. CONCLUSION

I respectfully RECOMMEND that Defendants' Motion for Summary Judgment be GRANTED and that summary judgment enter in favor of the defendants and against the plaintiff on both of the plaintiff's claims.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated September 12, 2005.

BY THE COURT:

/s/ Boyd N. Boland
United States Magistrate Judge